```
 1                 IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF NORTH CAROLINA
 2
   UNITED STATES OF AMERICA         ) Greensboro, North Carolina
 3                                   ) July 17, 2015
        vs.                          ) 11:30 a.m.
 4                                   )
   JUAN MORENO-TAPIA,                )
 5                                   ) Case No. 1:14CR241-1
        Defendant.                   )
 6 _____ )

 7
                       TRANSCRIPT OF MOTION HEARING
 8             BEFORE THE HONORABLE CATHERINE C. EAGLES
                      UNITED STATES DISTRICT JUDGE
 9
   APPEARANCES:
10
   For the Government:   ANAND P. RAMASWAMY, AUSA
11                       Office of the U.S. Attorney
                         101 S. Edgeworth Street, 4th Floor
12                       Greensboro, North Carolina 27401

13
   For the Defendant:    JOHN A. DUBERSTEIN, AFPD
14                       Office of the Federal Public Defender
                         301 N. Elm Street, Suite 410
15                       Greensboro, North Carolina 27401

16

17

18

19

20

21

22 Court Reporter:       Joseph B. Armstrong, RMR, FCRR
                         324 W. Market, Room 101
23                       Greensboro, NC  27401

24           Proceedings reported by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25
```

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

<u>P R O C E E D I N G S</u>

(At 11:30 a.m., proceedings commenced.)

(Defendant present.)

MR. RAMASWAMY:  Your Honor, the Government would call United States versus Juan Moreno-Tapia in 1:14CR241-1, represented by Mr. Duberstein, on a motion hearing.  We've been having the interpreter sworn as a precaution, as needed.

THE COURT:  All right.  The courtroom deputy will swear the interpreter.

(Interpreter sworn by the clerk.)

THE COURT:  Mr. Moreno-Tapia, I believe we've been proceeding in English, and the interpreter has been present in case you need her.  Is that how you want to proceed today?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Because she is here, if you want her to interpret every single thing that is said, she will gladly do that.  All you have to do is say so now.  Or at any time during the proceedings, raise your hand, and I'll stop, and we'll switch over to that.  Is that agreeable to you?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  You can be seated.  Can I have a minute to confer with the court reporter.

(Bench conference with court reporter.)

THE COURT:  All right.  So as I recall, we have talked several times about what should happen in this case as a

1  result of the state court vacating his convictions for --

2  primarily, we're talking indecent liberties, but I know we had

3  the other assault charge, too -- and there's a motion to vacate

4  the deportation order under 8, United States Code,

5  Section 1326(d), there's a conditional order to withdraw his

6  guilty plea, and there's a motion to dismiss the indictment.  I

7  believe you all have filed a bunch of briefs, and we've had

8  argument, and I took it under advisement, right?

9          MR. DUBERSTEIN:  That's my understanding, Your Honor.

10         THE COURT:  Okay.  I did not promise you all more

11  argument time, I don't believe.  So let me -- I have kind of a

12  long order to enter because I don't have time to turn it into a

13  written order which takes, you know -- takes me a couple weeks.

14  So I'm just going to basically read it.  But the upshot is, so

15  we can start out and we all know, I'm going to deny all three

16  of these motions.  After I go over my reasons for that, then we

17  can talk about what to do next.

18         So as I understand it, the facts are not in dispute.

19  I'll recite them, and you all can correct me should I be wrong

20  about any of these details.

21         In 2007, Mr. Moreno-Tapia pled guilty in state court

22  to felony serious injury by vehicle and three counts of felony

23  indecent liberties.  Before pleading guilty, he was not advised

24  by his attorney or by the Court that he would likely be

25  deported as a result of the convictions.

1           After he served an active prison term, the

2   immigration authorities initiated deportation proceedings based

3   on the indecent liberties conviction.  Mr. Moreno-Tapia stated

4   that he did not wish to contest removal or request withholding

5   of removal and signed a form to that effect.  He did not appeal

6   the deportation order, and he was deported.

7           Upon his deportation, he was advised that it would be

8   illegal for him to return without permission.  After

9   deportation, he took no action to seek reconsideration of the

10  deportation order or to reopen the deportation proceedings, nor

11  did he seek to vacate the state convictions.

12          At some point he returned to the United States

13  without permission from Homeland Security.  He was eventually

14  arrested -- I think it was a burglary charge, some sort of

15  larceny or burglary charge by state officials, and he

16  assumed -- that's not really important.  He was arrested by

17  state officials on some charge, and he soon thereafter was

18  charged in this court for failure to register as a sex offender

19  and illegal reentry of a removed alien.

20          After he pled guilty to illegal reentry pursuant to a

21  plea agreement, he moved in state court to vacate his 2007

22  state court convictions.  The state court granted the motion

23  finding Mr. Moreno-Tapia's guilty plea was not entered

24  knowingly and voluntarily because of the absence of information

25  concerning the immigration consequences.  The state court cited

*Padilla versus Kentucky*, though it did not find ineffective
assistance of counsel, which was the issue in *Padilla*, but it
did find that Mr. Moreno-Tapia's due process rights were
violated.

        Did I misstate any of the facts from the Government's
perspective?

        MR. RAMASWAMY:  No, Your Honor.

        THE COURT:  From -- Mr. Duberstein, from your
perspective?

        MR. DUBERSTEIN:  No, Your Honor.  I would add to that
that Mr. Moreno-Tapia had not actually seen the plea document
in question until I showed it to him during this case.

        THE COURT:  I believe that's the evidence, and I'll
accept that as a supplement to the findings of fact that I just
found.

        MR. DUBERSTEIN:  Thank you, Judge.

        THE COURT:  But he certainly was present when he pled
guilty.  I mean, I don't think these happened in his absence,
or he was physically present for -- yeah, but I certainly agree
that's the evidence as you just stated, and I'll amend it to
that.

        Now, Mr. Moreno-Tapia contends he is entitled to
relief because the deportation order at issue was invalid and
issued in violation of his due process rights and generally in
reliance on the *Mendoza-Lopez* case from the Supreme Court in

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

1987. I'm not going to give you all the full cites to these
cases because we've all talked about them, and they're in the
record. If that's not true, I may provide the cite.

So, first, I believe he contends that he meets the
standards established in the illegal reentry statute concerning
collateral attacks; and in the alternative, he contends that he
should not be required to have exhausted his administrative
remedies because his consent to deportation was not knowing and
voluntary. Is that right?

MR. DUBERSTEIN: Yes, Your Honor.

THE COURT: Okay. And in the alternative, he
contends that regardless of whether he met the statutory
requirements for a collateral attack, his due process rights
would be violated by allowing the Government to prosecute him
for illegal reentry when the underlying conviction -- when the
conviction underlying the deportation was vacated for
constitutional infirmity. Did I accurately state your
arguments, Mr. Duberstein --

MR. DUBERSTEIN: Yes, Your Honor, I'm just --

THE COURT: -- in summary form?

MR. DUBERSTEIN: I'm just referring to my original
document just to make sure that -- and the Court at that point,
you're just referring to the requirement of exhaustion, the
first one.

THE COURT: Yeah, exhaustion and --

1          MR. DUBERSTEIN:  Yeah.

2          THE COURT:  -- the second one.

3          Now, let me start with the Section 1326 issue.  So

4    after the *Mendoza-Lopez* decision, Congress modified the illegal

5    reentry statute to allow collateral attack on deportation

6    orders if three circumstances are met:  Mr. Moreno-Tapia has to

7    show that he exhausted his administrative remedies, that the

8    deportation proceedings improperly deprived him of the

9    opportunity for judicial review, and that the entry of the

10   deportation order was fundamentally unfair.

11         So looking at those first two requirements,

12   Mr. Moreno-Tapia does not contend he was affirmatively

13   misadvised by anyone involved in the deportation proceedings

14   concerning his right to contest the deportation or to appeal

15   the decision.  He admits he signed the consent to deportation

16   form.  He never sought any sort of review of any part of the

17   deportation proceedings, nor has he sought to reopen the

18   deportation proceedings for reconsideration in light of the

19   vacated state conviction.  He has not identified anything that

20   immigration authorities should have done during the course of

21   the deportation proceedings that they did not do, and the Court

22   thus finds that he's not met the first two requirements of the

23   statute as those requirements would ordinarily be interpreted.

24         It's also not clear -- I'm relying on that, but I

25   just would note that it is also not clear that he can show

1  fundamental unfairness of which prejudice is a part.

2  Mr. Moreno-Tapia says he was deported, and that was the

3  prejudice.  But the test is not whether he would have been

4  deported if he had not pled guilty, but whether he would have

5  been deported if his conviction had been vacated.

6          You know, I kind of wandered around the immigration

7  statutes.  If you read these cases, these 1326(d) cases, a lot

8  of them -- most of them have a pretty -- a pretty overwhelming

9  discussion of immigration law and this prejudice point.  You

10 all have not briefed that for me, and I will just say I haven't

11 really tried to figure that out.  I kind of wandered around in

12 the immigration statutes.  I looked at *Williams versus*

13 *Gonzales*, 499 F.3d 329, a Fourth Circuit case, which talked

14 about an alien's right to reopen; but then in its subsequent

15 history, it's pretty clear the Court really can't review the

16 agency's decision on such a motion to reopen.

17         There was a case, an unreported case in 2005, *Parikh*,

18 155 Fed Appx 635, which seems to indicate Mr. Moreno-Tapia

19 would have been deported anyway even if the conviction was

20 vacated.  But then there was a later case called *Dung Phan*,

21 667 F.3d 448, which seemed to indicate that maybe that wasn't

22 true.  So the upshot of that is I really have no idea about the

23 prejudice.  I'm not asking you to argue about it.  I'm just

24 saying it's not really been briefed.  I think as the defendant

25 presented it, the question was the deportation itself was the

prejudice, but I don't really think that's the test, and, you know, if this ever comes back, it would be my view we would have to explore that further, at least on the cases as I've read them so far.  I would certainly hope that wouldn't be true, but it looks like it's true.

Further, I would note that Mr. Moreno-Tapia has not contended he is innocent of the indecent liberties charge, and he has offered no evidence of innocence.  Indeed, there is substantial evidence of his guilt.  You know, even beyond his guilty plea, the recent affidavit from the victim just says she didn't think there was anything wrong with what he did, but she basically admits that the sexual conduct with the 15-year-old occurred.  So, it seems to me, it's very unlikely the third factor has been met, at least on the record that I have right now.  So that means that Mr. Moreno-Tapia has not shown the statutory grounds necessary for a collateral attack on his deportation.

Now, next, he contends that the deportation was not knowing and voluntary.  I believe the burden actually is on the Government to prove that it was.  So this is a little bit different, and he relies on a number of cases such as *Sosa* out of the Second Circuit case, I think we talked about the *Ortiz* case out of the Fourth Circuit, and the *Cerna* case, also a Second Circuit case, which indicate a waiver of a right to appeal a deportation order which is not knowing and voluntary

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

1   and is invalid so that the exhaustion requirement is excused.

2          So these cases concern rights one has with the

3   immigration proceeding.  None of them concern a lack of

4   knowledge about the reasons a deportable conviction might be

5   subject to collateral attack.  So it just does not seem to me

6   that due process requires that immigration officials evaluate

7   and advise someone facing deportation based on a deportable

8   criminal conviction of all the possible reasons the conviction

9   might be invalid or subject to being set aside or vacated.

10         And I don't think due process requires immigration

11  officials to advise someone facing deportation based on such a

12  criminal conviction that the person, you know, might want to

13  think about challenging the validity of the conviction or ought

14  to try challenge it in these proceedings.

15         I would also note that really the due process issue

16  is Mr. Moreno-Tapia's due process rights were protected in

17  state court.  He had substantial due process protections at the

18  state court level to seek a remedy for the unconstitutional

19  conviction, which, of course, ultimately he took advantage of.

20  You know, it's sort of interesting *Padilla* -- this is a side

21  note -- *Padilla* has been held not to be retroactive.  But, of

22  course, the state court ruled on knowing and voluntary grounds

23  which was -- and, of course, they can grant it even though it

24  isn't retroactive, I suppose.  There's still a violation.

25  That's really a side point that's not important.

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

 1          But it seems to me his due process rights in

 2    connection with obtaining review of the underlying conviction

 3    were fully protected and that he did knowingly and voluntarily

 4    consent to the deportation.  There's nothing to indicate any

 5    misinformation that was given to him, and it doesn't seem to me

 6    that the problem in his state court conviction bleeds over into

 7    the immigration proceeding.

 8          So, finally, the use of his vacated conviction, the

 9    use of the deportation, which was based on his vacated

10    conviction, to prosecute him for illegal reentry.  So, first,

11    as I think I just indicated by the way I just said that, the

12    new prosecution for illegal reentry is not based on the old

13    vacated conviction, it is based on the deportation; and the

14    deportation was based on a facially valid conviction at the

15    time of the deportation which was a deportable offense.  As I

16    just mentioned, there were no problems with the deportation

17    procedure, and it was valid when it was entered.

18          I would also say courts have consistently held in a

19    number of different contexts that the relevant question is

20    whether the underlying conviction was in place at the time of

21    the new conduct.  I kind of got into this reading the *Robertson*

22    case which was on the SORNA issue on the motion to dismiss, but

23    in *Lewis versus United States*, 445 US 55, a defendant charged

24    with possession of a firearm by felon contended that an

25    underlying felony conviction was unconstitutionally obtained,

and the Court held this was of no moment as it "...did not
alter the fact that the defendant had been convicted of a
felony at the time he possessed the firearm."  The *Lewis* court
also said that "...it [was] important...that a convicted felon
may challenge the validity of a prior conviction [and]
otherwise remove his disability before obtaining a firearm."
And as I mentioned previously, that is true here because
Mr. Moreno-Tapia could have challenged the validity of the
prior conviction before returning to the United States.

The Fourth Circuit subsequently applied *Lewis* in a
situation where the underlying conviction had actually been set
aside after the firearm was possessed but before trial, and
that was the *Kahoe* case, 134 F.3d 1230.  Both the *Lewis* courts
and the *Kahoe* case specifically overruled due process
arguments.  Now, Congress has since amended that statute, so I
believe vacated convictions aren't used anymore, but that
really doesn't undermine the due process analysis, and *Lewis*
continues to be applied in other contexts.

The *DuBose* case out of the Eleventh Circuit, 598 F.3d
726, applied it in a firearms case involving someone who was
subject to a domestic violence protective order, and they said
the validity of the underlying protective order was irrelevant.
That was also the decision out of the *McIlwain* case out of the
Eleventh Circuit, 772 F.3d 688, which involved a challenge to
the constitutional validity of a commitment to mental

1   institution in a firearms case.  And then, of course, you have

2   the *Robertson* case in the First Circuit in a SORNA prosecution.

3         So it seems to me that the due process argument has

4   been rejected.  And *Robertson*, of course, talks about the *Lewis*

5   case in detail.  *Mendoza-Lopez* doesn't help, it seemed to me,

6   because in that case there were no avenues for judicial review

7   of the decision at issue.  Here, the state court MAR statute

8   provides a well-established mechanism for judicial review of an

9   allegedly unconstitutional statute, and the *Mendoza-Lopez* court

10   specifically noted when it was talking about the *Lewis* case

11   that in *Lewis* the defendant had an opportunity to challenge the

12   predicate conviction in a judicial forum before he possessed

13   the firearm, and we have that same thing here.

14         So the illegal reentry statute focuses on whether the

15   defendant was deported, which is undisputed.  His deportation

16   was dependent on whether he had been convicted of a deportable

17   offense, which is also undisputed, because at the time of his

18   deportation he had been convicted.  That deportation was lawful

19   at the time it occurred, and at the time Mr. Moreno-Tapia

20   reentered the country his convictions were in place and

21   facially valid.  So it is not a due process violation for an

22   illegal reentry conviction to be based on a valid deportation

23   order resulting from a valid -- facially valid conviction, even

24   if after the reentry the underlying conviction is vacated on

25   constitutional grounds.

1    So in will say I had a lot of confusion, and I still

2  have some confusion about the 16-level enhancement and the

3  Government's concession on that because it sounded like the

4  Government was conceding it would violate Mr. Moreno-Tapia's

5  due process rights to add the 16-level enhancement at

6  sentencing for being deported after conviction of an aggravated

7  felony where that conviction has since been vacated.  But they

8  are not making the same due process concession about, for

9  example, the SORNA count in the indictment when we got to the

10  motion to dismiss the indictment.  They were making kind of the

11  opposite argument there.  And the reliance on *Padilla* just

12  didn't seem to me to really speak to the 16-level enhancement.

13  It concerned the defendant's Sixth Amendment right to counsel.

14  It's not retroactive.  It really has nothing to do with due

15  process rights.  So I'm just not sure there is a due process --

16  well, I don't think there is, and I will find there is not a

17  due process problem in giving him the 16-level enhancement.

18    The constitutional defect exception forecast in

19  *Luna-Diaz*, I know it's been discussed by a lot of courts, but

20  it was in a footnote.  It was basically a throwaway.  It didn't

21  apply in the case, and it has overwhelmingly been quoted to

22  note why it doesn't apply.  It has never received serious

23  examination and, it seems to me, to have a good bit of

24  inconsistency with the holding in *Lewis*, as I have previously

25  discussed.  So here we are.

1          I do acknowledge the facial appeal of

2   Mr. Moreno-Tapia's argument.  It was stated in a nice shorthand

3   manner in the *Bolieiro* case that I think somebody cited to me

4   out of the District Court of Massachusetts, 923 F.Supp.2d 319,

5   and the Court there said, "Given that the 1992 deportation

6   order, Ms. Bolieira's actual removal, and this prosecution all

7   stem from a constitutionally flawed and now-vacated conviction,

8   common sense dictates the dismissal of this indictment."  Maybe

9   that's so.  But that is essentially a policy argument more

10  appropriate for Congress to consider or possibly it's an

11  equitable argument, but it is not a due process analysis.

12          And I would just point out that even from a policy or

13  equitable point of view, there are other facts than the fact

14  that the conviction was vacated.  Mr. Moreno-Tapia didn't do

15  anything to vacate those convictions or seek reconsideration or

16  try to reopen the deportation decision.  He was deported, told

17  he couldn't come back.  He came back anyway.  He didn't

18  register as a sex offender even though his conviction was valid

19  at the time.  And he has not contended or shown that he is

20  actually innocent of the charges, and there's substantial

21  evidence of guilt.

22          And it's perfectly reasonable for Congress to say

23  that persons with facially valid convictions of certain kinds

24  of felonies should be deported and that those persons should

25  not reenter the United States without permission, and, if those

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

1  convictions are for sex offenses, the person should register.

2  If Congress wants to change this so that the subsequent conduct

3  is not a crime when the underlying conviction is found to be

4  constitutionally infirm, they can certainly do that just as

5  they did after the *Lewis* case about possession of a firearm by

6  a felon.  Maybe they should.  I just don't have -- that's just

7  not my job.  That's their job.

8          So I conclude that there were no due process defects

9  in connection with the deportation process and that

10 Mr. Moreno-Tapia does not meet the statutory requirements for a

11 collateral attack.  It is not a violation of due process when

12 someone who has been lawfully deported based on a facially

13 valid aggravated -- a facially valid felony conviction and who

14 has been advised that it would be illegal to come back into the

15 country is prosecuted for exactly that action.

16         So the Court will deny the defendant's motion to

17 vacate the deportation order.

18         The motion to withdraw the guilty plea was

19 conditional, so that is denied as moot.

20         To the extent the motion to dismiss the indictment is

21 still before the Court, it is denied as well.

22         Now, I hope that was reasonably clear, okay, because

23 I'm not going to do a written -- I'll just do a written order

24 that denies them for the reasons stated in court.  So that

25 leaves us with sentencing, which is still a big mess.

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

 1          MR. DUBERSTEIN:  Your Honor, if I could raise one

 2     issue before we move on?

 3          THE COURT:  Yes.

 4          MR. DUBERSTEIN:  I'm not sure -- the only reason I

 5     want to say it is because I'm not sure I raised it before.  I

 6     wasn't sure it was relevant before.  I think the Court made

 7     reference to the fact that -- several occasions that the

 8     defendant didn't raise his issue under the exhaustion

 9     requirement.  We're really dealing in two worlds with that

10     issue.  One is the world of raising a collateral attack against

11     a criminal complaint, or criminal conviction in his case, and

12     one is reopening the immigration issue.

13          THE COURT:  Right.

14          MR. DUBERSTEIN:  So *Johnson* -- I can't remember the

15     exact cite of *Johnson*, but it's a Supreme Court Case.

16          THE COURT:  From last week or two weeks ago, that

17     *Johnson*?

18          MR. DUBERSTEIN:  No, no, not that *Johnson*, not the

19     armed career criminal *Johnson*.

20          THE COURT:  Okay.

21          MR. DUBERSTEIN:  This is a *Johnson* case on 2255 cases

22     and when you have the ability to file a collateral attack on a

23     prior conviction, and they've ruled -- the Supreme Court has

24     ruled that you have a reasonable amount of time from the time

25     you discover the constitutional defect to file.

1          So I think -- and his obviously wasn't a federal
2    court.  It was in state court.
3          THE COURT:  Right.
4          MR. DUBERSTEIN:  But, again -- and obviously we
5    disagree with the Court's ruling that the constitutional
6    violation doesn't bleed over into the immigration context.  But
7    I would raise the *Johnson* case as a cite in support of the fact
8    that there was no way for him to reopen -- it would be futile
9    for him to reopen his case without the knowledge of his
10   suspect's prior conviction, and he didn't know about the
11   suspect prior conviction until 2014.
12         THE COURT:  Well, I don't know.  Maybe that's so.
13   But he certainly knew when he was deported that the reason he
14   was being deported was his conviction for indecent liberties,
15   and what he didn't know when he pled guilty was that that
16   conviction was going to lead to his deportation.  So the thing
17   that he didn't know that made his plea involuntary in 2007, he
18   did know in 2009.
19         So I appreciate your argument, and maybe you're
20   right.  It almost makes it worse in some ways because that
21   means he had no reason to think it was okay to come back to
22   this country when he had a valid conviction, I mean, on
23   equitable grounds, and yet he came back anyway, which is not
24   relevant to the due process analysis.
25         MR. DUBERSTEIN:  Thank you, Your Honor.

1      THE COURT:  All right.  I'll note that.  Now,

2  speaking of *Johnson*, *Johnson* from just the other day.

3      MR. DUBERSTEIN:  Right.

4      THE COURT:  You know, I finally got these motions

5  resolved, and then I realized I still had the guidelines issues

6  to deal with, and they really seem to be not that clear to me

7  at this point.  I believe, starting with the easy part -- do

8  you all have a presentence report in front of you?  You might

9  want it.

10      MR. RAMASWAMY:  Yes, Your Honor.

11      THE COURT:  Okay.  Paragraph 24, which is these

12  indecent liberties convictions we've just been talking about,

13  and in the presentence report filed back, oh, my gosh, last

14  November, he got three points to his criminal history level.

15  And I believe it's clear under 4A1.2, specifically Note 6, that

16  he should get zero points for that because that's been vacated.

17  Does everybody agree with that?

18      MR. RAMASWAMY:  Yes, Your Honor.

19      MR. DUBERSTEIN:  Yes, Your Honor.

20      THE COURT:  Okay.  So I believe that changes his --

21  in paragraph 25, his total criminal history score would become

22  two, and that would establish a criminal history score -- a

23  criminal history category of II, right?  For the Government?

24      MR. RAMASWAMY:  Yes, Your Honor.

25      MR. DUBERSTEIN:  Yes, Your Honor.

              THE COURT:  All right.  So that seems like the easy

part.

              Now, if we turn back to the offense level calculation

beginning on paragraph 10, first, the base offense level is

still eight, and nothing has happened to change that.  But when

we get to paragraph 11 -- and I will just say I have not had

time to really focus on the guidelines interpretations here,

which, you know, kind of put the due process problem aside,

because I don't think there's a due process problem with giving

him 16 or 12 or any number of points.  But in terms of what the

guidelines say, I'm not completely sure.  He should not get 16

levels because 2L1.2(b)(1)(A)(ii) says you only get 16 if

you've got points in your criminal history category

calculation.  So you can't get 16 because that seems to me to

be pretty obvious.  But it does say if you don't get points

there, you would get 12.  It's plus 12.  And I don't know if

the definition of "conviction" from Chapter 4 applies to this

enhancement in Chapter 2 or not.  So that's question one.

              Second, the reason for the enhancement at all only

applies if indecent liberties is a crime of violence.  So I --

*Johnson* -- you know, this thought just occurred to me this

morning.  Is the *Johnson* case from a couple weeks ago going to

have an effect on that?  Everybody is nodding like, oh, yeah,

it might, I assume.  I don't know if it will or not.  I just --

that just occurred to me this morning.

1          All right.  So there we are.  So that's the problem

2     with 11.  Is there a 12-point enhancement, or is there a

3     zero-point enhancement is how I understand the question at the

4     moment.  I think there's also a question as to 17 and 18 at

5     this point in the proceedings as to acceptance of

6     responsibility.  And then should it be zero for paragraph 11,

7     there would be an inadequate criminal history question.

8          I think we can do a couple of things.  We can all

9     just go away one more time and think about all these guidelines

10    and try to figure them out.  I am required to properly

11    calculate the guidelines, and that is a bit of a mess today.

12    On the other hand, the facts aren't really in dispute.  So, you

13    know, if you all want to take a little break, consult about

14    these guidelines, I'll take my best shot at the guidelines

15    today.

16          But, you know, what really -- the guidelines are

17    helpful because they identify the important facts.  In this

18    case, I know what the important facts are, so I can make an

19    appropriate sentencing decision, sort of almost regardless of

20    what the guideline calculation is because the important facts

21    are he was arrested, he did get convicted, he did get deported,

22    his conviction was vacated.  These facts are all very

23    important, you know, but I'm sensitive to the fact that the

24    defendant may not have been prepared today to deal with the

25    possible decision on acceptance of responsibility and

1  inadequate criminal history.  I know I had talked with the

2  probation officer about that, but I don't believe that may have

3  been in any communication with you all.

4        So the alternatives that I see are that we take a

5  recess for a month, let the Probation Office recalculate, put

6  something out there in a couple of weeks, let you all look at

7  it, object, and we'll come back.  You know, that will take some

8  time, but I obviously want to do it right.  I know we've all

9  been talking about, well, his guideline might just be zero to

10 six; and while that's true, one might easily think that might

11 not be enough time, so that might not be as big a problem -- I

12 haven't decided what his sentence is, but, you know, that's

13 perhaps not as big a problem as I was thinking it might be.

14       So we can do that, or we can take a short recess

15 right this second, you all can talk; I can put it on for some

16 time, you know, sooner than that without a formal

17 recalculation; or I can just sentence him today doing the best

18 I can with the guidelines and then making an appropriate

19 decision under 4553(a).  So shall we take a short recess and

20 you all talk, or do you already know what you want to do

21 without talking to each other?

22       MR. DUBERSTEIN:  Your Honor, I would at least like

23 time to consult with my client.  I'm happy to talk to

24 Mr. Ramaswamy, too.

25       THE COURT:  All right.  Absolutely.

1          MR. DUBERSTEIN:  I'm inclined to not have him

2   sentenced today, but I want to hear what he has to say about

3   how he wants this to proceed.

4          THE COURT:  All right.  My inclination is, you know,

5   to put it off and have it recalculated and have us all have

6   time to think about it and go through the steps and deal with

7   it, you know, appropriately.  So that's the default.  I just

8   wanted to offer, you know -- and, of course, we can do it that

9   way.  Then if you all talk and you confer further with your

10  client, we can reschedule it for sooner than that.  I would

11  have no real problem with that, assuming I could work you into

12  my ever-increasing court schedule.  So do you want me to just

13  go ahead and schedule it, and then if you all work something

14  out, or are you agreeing we can move it up, or do you want to

15  talk to him, Mr. Duberstein?

16         MR. DUBERSTEIN:  If I could, Your Honor, yes.  Thank

17  you.

18         THE COURT:  Let me take about a 5-minute recess or 10

19  minutes if you need longer.

20         MR. DUBERSTEIN:  Five is fine.

21         THE COURT:  All right.  We'll take a 5-minute recess.

22         (At 12:06 p.m., break taken.)

23         (At 12:19 p.m., break concluded.)

24         THE COURT:  All right.  Shall we have the Probation

25  Office recalculate?

 1            MR. DUBERSTEIN:  Yes, Your Honor.  I've discussed

 2    with it Mr. Ramaswamy and my client.  I think it would be

 3    better if we had time to prepare.  The Court's raised a number

 4    of issues that I haven't even begun to research yet, including

 5    the *Johnson* issue but also the acceptance of responsibility.

 6    The 16-level issue I'm not sure has been settled one way or the

 7    other even on the original objection to it, the one that we

 8    agreed with with the Government.

 9            THE COURT:  Right.  I think that's right.  I

10    wasn't -- yeah, I didn't -- I read everything you all said

11    about the 16-level.  It just didn't seem to really address the

12    language of the guidelines, you know.  So that's, I think, the

13    question that I have left.  I don't have a constitutional

14    problem with it.

15            So what's the best thing?  Probation is quite backed

16    up with meth -- methamphetamine conspiracies and such, I know

17    from having the criminal term this month, and I don't really --

18    I really haven't thought about the career offender crime of

19    violence thing at all.  *Johnson* may be just a nonissue, and it

20    may be that the whole guidelines interpretation, paragraph 11,

21    is easy, but it may not be.  Do you all have a timing

22    suggestion?

23            MR. DUBERSTEIN:  Your Honor, if I could, I would like

24    to ask that we be doing the whatever it is -- let's set it for

25    late August, if that's possible.  Then if somehow -- I think

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

1 this was our agreement with the Government -- if we were able

2 to agree on something or we came to terms and we felt like

3 there wasn't anything else outstanding, and we were ready to

4 go, we could ask the Court if you had an earlier time.  I'm

5 going to be out-of-pocket for the first two weeks of August

6 basically, and I don't think we'll be ready.  I think that

7 would be the very bare minimum.

8        THE COURT:  Oh yeah, that seems kind of -- I can do

9 it on September 3 at 9:30.

10        MR. DUBERSTEIN:  Your Honor, can I look at my

11 calendar?  I'm sorry.  It's on my phone.  I just want to make

12 sure I'm not double-booking something.  Your Honor, that would

13 be fine.  September 3 would be fine with us.

14        THE COURT:  You all will be looking at the *Johnson*

15 issue, and maybe -- maybe that's just not an issue.  I

16 certainly hope so.  I'll ask the Probation Office to do a

17 recalculation.  Let's see.  Today is the 17th.  That's

18 basically seven weeks from now.  So how about if the Probation

19 Office shoots for a draft on, say, August 7.  That's three

20 weeks for the Probation Office, and then you all respond within

21 one week -- no, you're going to be gone the first two weeks in

22 August.

23        MR. DUBERSTEIN:  Yes, I will.

24        THE COURT:  The 21st then.  You all respond to her by

25 the 21st and consult with each other and such.  Do that usual

1  thing required by the local rules.  Then I'll ask her to send
2  me a final memo on the 27th of August, and that will give me a
3  week.  So do you all want her to just recalculate the
4  guidelines, or do you want her to do -- would it be cleaner to
5  do a revised final report when she --
6        MR. DUBERSTEIN:  I think, Your Honor, given the fact
7  that we've discussed the guidelines in not just one but several
8  aspects, including acceptance and all these other things as
9  well as criminal history, I think it would be better to have a
10 full report, but I don't know.  An abbreviated memorandum might
11 be enough if that's -- if that includes all of those things,
12 and it's clear enough for purposes of the record.
13        THE COURT:  Any preferences?
14        MR. RAMASWAMY:  No preference, Your Honor.
15        THE COURT:  Well, I'll just -- I mean, obviously it
16 has to include the guidelines conclusions.  It has to include
17 the criminal history.  It may need to include the facts of, you
18 know, the motion that was filed and the ruling on the motion.
19 Maybe it's just better to do a revised final report.
20 Obviously, lots of it won't change.  So I would just ask you to
21 do a revised draft or whatever, I don't know, named something
22 like that.  Then you all can object and confer.  We'll do it as
23 if it was -- since I'm not telling her how to recalculate the
24 guidelines, I think I want to give you all a chance to object
25 and confer before it's finalized by the Probation Office in the

US v. Moreno-Tapia - Motion Hearing - July 17, 2015

1    usual way.

2            All right.  So is everybody clear on the dates?

3    Ms. Winchester, have you got those for the minute entry?

4            THE CLERK:  Yes, ma'am.

5            THE COURT:  All right.  I'm very sorry this is taking

6    a long time, but I actually think we've moved pretty quickly

7    once it kind of got to me, and it's just a complicated matter,

8    and I do want to try to do it the right way.  So there we are.

9    Anything else we need to take care of in his case today?

10           MR. DUBERSTEIN:  Not today.  Thank you, Your Honor.

11           THE COURT:  No?

12           MR. RAMASWAMY:  No.

13           THE COURT:  All right.  We will be adjourned.

14           (At 12:26 p.m., proceedings concluded.)

15                        *  *  *  *  *

16                    C E R T I F I C A T E

17       I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.
18

19

20   Date: 11/23/2015     Joseph B. Armstrong, RMR, FCRR
                          United States Court Reporter
21                        324 W. Market Street
                          Greensboro, NC  27401
22

23

24

25

US v. Moreno-Tapia - Motion Hearing - July 17, 2015